1
2
3
4

5             **UNITED STATES DISTRICT COURT**

6                   **DISTRICT OF NEVADA**

7

8    AVNER MANDLER,                      )
                                         )
9                        Plaintiff,      )        Case No. 2:13-cv-1636-GMN-GWF
                                         )
10   vs.                                 )        **FINDINGS AND**
                                         )        **RECOMMENDATION**
11   CAROLYN W. COLVIN,                  )
     Commissioner of Social Security,    )
12                                       )        Motion to Remand (Dkt. #14)
                         Defendant.      )        Cross-Motion to Affirm (Dkt. #17)
13   _____)

14          This case involves judicial review of administrative action by the Commissioner of Social

15   Security denying Plaintiff Avner Mandler's claim for disability benefits under Title II of the Social

16   Security Act.  Plaintiff's Complaint (Dkt. #1) was filed September 9, 2013.  Defendant's Answer

17   (Dkt. #7) was filed December 5, 2013, as was a certified copy of the Administrative Record

18   ("AR").  (Dkt. #8).  Plaintiff filed his Motion to Remand (Dkt. #14) on February 18, 2014.  The

19   Commissioner filed her Cross-Motion to Affirm and Opposition to Plaintiff's Motion for Reversal

20   and/or Remand (Dkt. #17 and #18) on May 5, 2014.  This matter has been referred to the

21   undersigned United States Magistrate Judge for Findings and Recommendations.

22                          **BACKGROUND**

23          I.      **Procedural History.**

24          On June 26, 2010, Plaintiff filed a Title II application for a period of disability and disability

25   insurance benefits, alleging that his disability began on July 1, 2008.  AR 32.  Plaintiff's application

26   for benefits was initially denied by the Social Security Administration on September 17, 2010.  AR

27   71.  Upon reconsideration, it was again denied on March 17, 2011.  AR 78.  Plaintiff requested a

28   hearing before an Administrative Law Judge (ALJ) and testified at a hearing before the ALJ on

February 13, 2012.  AR 45-57.  Vocational Expert Jack M. Dymond also testified at the hearing.
AR 58-60.  The ALJ found that the Plaintiff was not disabled between July 1, 2008, and February
28, 2012, the date of the ALJ's decision.  AR 32-39.  Plaintiff filed an appeal with the Appeals
Council on April 24, 2012 which was denied on June 4, 2013.  AR 5-6.  Plaintiff then commenced
this action for judicial review pursuant to 42 U.S.C. § 405(g).

## II.   **Factual History.**

### A.   **Disability and Function Reports.**

Plaintiff Avner Mandler was born on August 6, 1962.  He was 47 years old when he applied
for disability benefits on June 26, 2010.  AR 132.  He is 5'7" tall and weighs 200 pounds.  AR 135.
At the time of his application, Plaintiff was married and had two children.  AR 122-123.  Plaintiff
completed four or more years of college.  Following his discharge from the United States Navy in
1996, Plaintiff was employed in an executive position with the Boy Scouts of America and in
various positions selling time shares, cars, and insurance.  AR 136.

The Plaintiff stopped working on July 1, 2008 and alleges that he became disabled on that
same day.  AR, 132, 135.  In a Field Office Disability Report completed on July 7, 2010, Plaintiff
listed 10 different conditions that limit his ability to work: Epstein-Barr virus, chronic fatigue
syndrome, memory loss/confusion/inability to focus, sleep deprivation, recurrent viral pneumonia,
bronchial asthma, chronic sinus disease/infections, essential tremors, bio film - impervious
layer/lipid layer in sinus, and sleep apnea.  AR 135.  He listed 14 medications he takes to combat or
control his ailments.  AR 138.  In the general remarks section of the disability report, Plaintiff
stated:

> I am a Disabled Veteran with a 80% disability rating.  I petitioned the
> VA and I am awaiting a decision on an increase to 100% due to
> health reasons and unemployability.  I was originally at 60% upon
> retirement in 1996, I was raised to 80% in 2002 due to continuous
> sinus operations with no relief.  I have had a UPPP procedure to
> correct the Sleep Apnea, however this did not prevent me from
> needing the assistance of the CPAP machine in 2008.  I take
> medication through a sinus nebulizer 2 times a day as well as my
> other medications.  Since my primary care doctor and my
> allergy/asthma immunology doctors have exhausted all measures
> available to them to help me, they have started referring me to
> specialists at UCLA which require me to travel to California for
> treatment.  In the past six months, I have had 3 doctor appointments

2

in California.  I had a regular sleep study done in 2008, a regular sleep study with an extended portion (2 day study) in 2009 and now will be doing another sleep study in August 2010.  I am awaiting a referral to an infectious Disease Doctor at UCLA as well.  You will find documentation in my military medical record of Asbestos Exposure and my health slowly declined since that time and unfortunately has continued through today.  I am told the Epstein Bar Virus takes 5 to 6 years before recovery is seen, if recovery is even possible.  My immune system is continuously fighting itself to recover to no avail.  It i (sic) like a vicious circle with no end.  In addition to all the other medication I am on and the requirement of daily naps lasting between 1 to 4 hours just to make it through dinner it is not an enjoyable life to lead, however, these are the cards that I have been dealt and continuous doctor visits and daily medication to include daily nebulizer treatments is now my life.

AR 144-145.

In his Function Report, dated August 21, 2010, Plaintiff stated that he spends his days trying to do things around the house but usually loses all energy and has to take a 2-3 hour nap.  He then gets up for dinner and goes right back to bed.  AR 174.  Since his symptoms arose, he has been unable to work full time, focus, or remember things.  *Id.*  Even with CPAP treatment, he still suffers from sleep deprivation.  He shaves some days, dresses some days, and tries to bathe every day, but sometimes bathes every other day.  AR 174.  He no longer cooks daily, as he did before the symptoms arose.  He either is too tired, or he loses focus and ruins the food.  He sometimes forgets if he has taken his medication.  He is able to do laundry once every two weeks, but it takes him all day because of his memory problems.  AR 175.  He can drive a car, handle a savings account, and count change.  AR 176.  His conditions affect his ability to lift, squat, bend, stand, reach, walk, kneel, talk, climb stairs, see, complete tasks, or follow instructions.  He can only walk 200 feet before needing to stop and rest.  His attention span varies due to fatigue.  AR 178.

Plaintiff's adult daughter, Mairead Christine Mandler, submitted a Third Party Function Report on August 1, 2010.  AR 157-164.  Ms. Mandler stated that she sees her father 3-4 times a week and talks to him every day.  AR 157.  She stated that Plaintiff "has chronic fatigue and bronchial asthma which has reduced his ability to work or even complete some day to day activities.  He gets drained and weak when doing simple activities and has to lay down in order to prevent him from becoming even sicker."  *Id.*  In regard to Plaintiff's daily activities, Ms. Mandler stated that "[h]e wakes up and eats and trys (sic) to complete things around the house but becomes

3

tired and has to go back to bed till dinner.  He eats dinner and socializes for a while before needing to go back to bed."  AR 158.  Even with use of a CPAP machine, Plaintiff still wakes up 5-6 times a night.  *Id.*  Plaintiff's illness does not affect his ability to dress.  He tries to bathe daily, but it is sometimes a challenge.  When he is too weak to get out of bed, he does not shave for days.  He is otherwise able to take care of his personal hygiene.  AR 158.  Ms. Mandler stated that Plaintiff needs reminders to take his medications.  AR 159.  Plaintiff is able to prepare his own meals "once-twice a month" and it takes him an hour to do so.  *Id.*  She stated that Plaintiff used to cook daily, but now rarely does so because "he has little energy and is to (sic) weak to prepare meals and need (sic) the help of his wife to cook his meals."  AR 159.  Plaintiff "does laundry once every two weeks and it takes him all day."  *Id.*

Ms. Mandler stated that Plaintiff is able to drive and ride in a car and can go out alone.  AR 160.  He is able to go food shopping "3-4 times a month for at least an hour."  AR 160.  He is able count change, handle a savings account, checkbooks and money orders.  *Id.*  Plaintiff no longer engages in hobbies such as cooking, bike riding, going to the gym, walking his dog, dancing or camping.  AR 161.  He no longer belongs to the Kiwanis Club and does not do volunteer work as he did before his illness.  Plaintiff talks on the phone, sends emails and "will visit with people if they come to him."  He goes to doctors offices and his daughter's house on a regular basis.  AR 161-162.

Ms. Mandler stated that Plaintiff can lift only 15 pounds, and when bending he has a hard time getting back up.  He gets weakness in the legs while standing and can only walk 200 feet without stopping to rest for 10 minutes.  He has loss of breath when climbing stairs.  AR 162.  Plaintiff sometimes mumbles and takes a while to get out his thoughts.  His hearing has become worse.  His eyes get tired and it affects his sight.  Plaintiff forgets things easily, which affects his ability to complete tasks and follow instructions.  AR 162, 164.  Plaintiff does not finish what he starts, but is able to follow instructions "pretty well."  As far as spoken instructions, "he forgets things sometimes and has be (sic) retold instructions."  AR 162.  Plaintiff gets along pretty well with authority figures.  He gets easily stressed and does not handle change in routine well.  Ms. Mandler stated that Plaintiff "sleeps all the time and gets upset when he cannot complete a task.'

4

1    AR 163.

2        **B.      Plaintiff's Hearing Testimony.**

3        Plaintiff testified at the February 13, 2012 hearing that he was medically retired from the

4    Navy in 1996 due to chronic sinusitis, chronic bronchial asthma, and delayed gastric emptying (acid

5    reflux).  AR 48-49.  Plaintiff testified that his last job was in timeshare sales.  He stopped working

6    in July 2008 because he ended up in the hospital with full-blown viral pneumonia and

7    mononucleosis.  AR 49.  He stated that he had spent the last three years trying to find a cure for his

8    conditions.  *Id.*  Plaintiff testified that chronic fatigue and sleep deprivation are the main things that

9    prevent him from working.  AR 49.  He has been diagnosed with severe sleep apnea and uses a

10   CPAP machine, but it does not help.  AR 50.  Plaintiff testified that he has a disability rating from

11   the Veterans Administration ("VA").  He initially received a 60% disabled rating:  followed by a

12   rating of 80% in 2002 where he remained until 2008.  He waited a year to file for an increase in his

13   disability rating because he was hoping he would recover and get better.  He stated:  "[W]hen I saw

14   I didn't recover and I was being told by doctors that I would not recover, I petitioned the VA and

15   they put me through a year of doctor visits, tests, evaluations."  AR 50.  He was then rated as 100%

16   disabled and unemployable.  *Id.*

17       Plaintiff testified that his days consist of driving his stepdaughter to school, then going back

18   to sleep for a while, having lunch, picking up his stepdaughter, and then usually going back to sleep

19   until dinner.  AR 51.  He occasionally does some housework and tries to do his own laundry once a

20   week, but it sometimes ends up being every two weeks.  His wife takes care of everything else.  *Id.*

21   He suffers from fatigue throughout the day.  AR. 52.  He also has a herniated disc in his lumbar

22   spine, L5-S1, which precludes him from prolonged standing or walking.  He estimated that he

23   could stand for 15 minutes out of every hour before his "legs go completely numb."  *Id.*   Plaintiff

24   also testified that, as a result of the four sinus surgeries, his sinuses are wide open and he has a

25   "constant nasal drip that goes down into my chest."   The combination of his low back and sinus

26   problems causes his body to lose all energy and he has to sit down or lay down.  AR 52.  He can

27   walk 200 feet, at most, without major complications.  AR 53.  He also has chronic bronchitis which

28   is caused by his nasal drip and asthma.  He testified that he has "[s]evere sinus headaches" every

day which last until he takes one or two Motrin pills, 800 milligrams each. AR 53.

Plaintiff testified that he suffers from chronic viral pneumonia which he has had since he was exposed to asbestos in the Navy. AR 53-54. He gets pneumonia on a yearly basis. *Id.* His asthma also causes him to experience shortness of breath and makes it hard to breath. AR 54. Plaintiff testified that he was diagnosed with Epstein-Barr virus and hepatitis 6 in 2008 which also causes his chronic fatigue and sleep deprivation. AR 54. His doctors have informed him that there are no treatments for either condition. *Id.*   The sleep deprivation affects his concentration. It causes him to be "very foggy" and that it is sometimes "difficult to put together sentences and talk." AR 54-55.

Plaintiff testified that his chronic fatigue, sleep deprivation and inability to do prolonged walking prevent him from working. AR 56. He estimated that he would be unable to work three to four days out of a five day work week, stating that "if I over exert myself in one given day, it could take me a week to two weeks to recover from that where, meaning that I would have enough energy to get out of bed and walk and just function a quality of life of daily living." AR 56. Plaintiff stated that he has a very minimal social life. He does not go out for entertainment and rarely goes out to dinner. He goes to the store with his wife. He indicated that he can go out provided "I've had enough rest that day. If I had just gotten up from taking a nap, then I could function for maybe two, three hours before I'd have to take a nap again." AR 57. He testified that he takes two Lortabs a day which make him drowsy. *Id.*

### C. Vocational Expert's Testimony.

Vocational expert Jack Dymond testified that Plaintiff's past work as an executive director of the Boy Scouts of America and as a timeshare salesman are both classified as sedentary work with an SVP of 8 and Dictionary of Occupation Titles ("DOT") Nos. 195.117-010 and 163.167-018, respectively. His past work in auto sales was light work with an SVP of 6 and DOT No. 273.353-010. AR 58. The ALJ asked Mr. Dymond to assume a hypothetical younger individual between the ages of 45 and 49 with the same work and medical history as the Plaintiff, and whose impairments would limit him to light exertional work with occasional climbing of stairs and ramps: no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching,

and crawling; no exposure to highly concentrated chemicals, dust or fumes, or fumes found in an industrial setting like a sawmill or chemical plant; no exposure to temperature extremes, such as found in the southwest; and no exposure to exposed heights or constantly moving dangerous machinery such as a printing press or thrashing machine. AR 59. The ALJ asked whether an individual with these limitations would be able to perform Plaintiff's past work. Mr. Dymond responded that such an individual would be able to perform Plaintiff's past work. The ALJ asked Mr. Dymond whether the hypothetical individual would be "competitively employable" if he were absent from work more than two days per month, either due to not going into work or departing from the workplace at will and not completing an eight hour day. Mr. Dymond stated that the person would not be employable because no more than one day of absence per month would be acceptable. AR 59-60.

### D.   Veteran's Administration Disability Finding

On July 20, 2010, the Veterans Administration (VA) granted Plaintiff a 100% disability rating effective July 30, 2009, finding that he was unable to work due to service connected disabilities. AR 201. The VA determined that five medical conditions were related to the Plaintiff's military service: chronic fatigue syndrome, viral pneumonia, chronic sinusitis, bronchial asthma, and hypertropic gastritis. (AR 200-201). These medical conditions were respectively assigned disability ratings of 60%, 0%, 50%, 60%, and 10% on a 0-100 scale. (AR 200-201). The VA found that Plaintiff's Epstein-Barr virus was not service connected. In its accompanying Rating Decision, dated July 14, 2010, the VA discussed each rated medical condition separately. In regard to Plaintiff's chronic fatigue syndrome, the VA stated:

> Based on examination findings and a complete review of the evidence in your claim file the examiner diagnosed chronic fatigue syndrome. The examiner stated your chronic fatigue is most likely the result of your chronic and recurrent rhinosinusitis, asthma, and sleep apnea. This is also based on the knowledge that fatigue is one of the most common symptoms in those chronic problems.

> During the examination your debilitating fatigue was recorded as constant. Your fatigue was noted to last 24 hours or longer following exercise. You stated you are almost totally restricted from routine daily activities due to chronic fatigue. Symptoms you reported were generalized weakness, migratory joint pains, sleep disturbance, inability to concentrate, forgetfulness, confusion and headaches.

> The examiner stated that the criterion of the new onset of debilitating fatigue is severe enough to reduce or impair your average daily activitiy below 50 percent of your pre-illness activity level for a period of six months.  It was also noted that your chronic fatigue syndrome meets at least six of the ten chronic fatigue syndrome diagnostic criteria.
>
> Service connection for chronic fatigue syndrome has been established as related to the service-connected disability of bronchial asthma with symptoms of sleep apnea.
>
> An evaluation of 60 percent is assigned from August 3, 2009.  This effective date is based on the date we initially received your claim for this condition.  An evaluation of 60 percent is assigned whenever there is debilitating fatigue, cognitive impairments (such as inability to concentrate, forgetfulness, or confusion), or a combination of other signs and symptoms which are nearly constant and restrict routine daily activities to less than 50 percent of the pre-illness level; or signs and symptoms which wax and wane resulting in periods of incapacitation of at least six weeks duration per year.
>
> The evidence is not suggestive that a higher evaluation is warranted.  A higher evaluation of 100 percent is not warranted unless signs and symptoms are nearly constant and so severe as to restrict routine daily activities almost completely and which may occasionally preclude self-care.

AR 207-208.

The VA Rating Decision also stated:

> Based on the medical evidence from your private physicians and the evidence in your VA medical examinations, the evidence shows your service connected disabilities clearly prevent your ability to seek and maintain gainful employment.  Your chronic fatigue has reduced your ability to perform many activities of daily living.  Your respiratory conditions have been shown to require constant care by medical professionals.  These conditions require frequent office visits for testing and treatment.  Although treated with a CPAP, your sleep apnea causes daytime hypersomnolence which would affect your ability to work.

AR 209.

In regard to Plaintiff's bronchial asthma, the VA noted that Plaintiff used anti-inflammatories and a bronchodilator daily, and that he reported 3 asthma attacks a week.  AR 212.

A rating of 60% disability was found to be appropriate for Plaintiff's bronchial asthma due to "at least monthly visits to a physician for required care of exacerbations."  AR 213.  The VA evaluated Plaintiff's broncial asthma and sleep apnea together.  AR 213.  The sleep apnea warranted a 50% disabling rating because it was treated with a CPAP machine.  AR 213.  The rating of 60% was

8

given for the combined evaluation of the asthma and the sleep apnea. AR 213. In regard to the Plaintiff's chronic sinusitis, the VA noted that Plaintiff reported incapacitating episodes that can last for 4-6 weeks. AR 214. Due to Plaintiff's reported headaches, fever, purulent drainage, and sinus pain, the VA concluded that this condition was 50% disabling, which was the maximum rating for those symptoms. AR 214. The VA examiner assigned a disability rating of 10% to Plaintiff's "epigastric distress, dysphagia, pyrosis, regurgitation, or substernal or arm or shoulder pain." AR 215.

The record also includes VA medical examiner Tri M. Truong's February 19, 2010 findings and conclusions based on his review of the medical records and examination of the Plaintiff. AR 696-739. Dr. Truong stated that Plaintiff's chronic fatigue syndrome had an onset date of June 2008. The fatigue did not wax and wane and it lasted 24 hours or longer. AR 722. Plaintiff's daily activities were almost totally restricted, and this level of restriction had lasted 12 months. *Id.* Plaintiff's symptoms were generalized weakness (constant), migratory joint pains (frequent), sleep disturbance (constant), inability to concentrate (constant), forgetfulness (constant), confusion (frequent) and headaches (constant). *Id.* Dr. Truong noted that the following problems were associated with the diagnosis of chronic fatigue syndrome: chronic sinusitis/bronchial asthma and sleep apnea. AR 723. He stated that the effect on the Plaintiff's occupational activities were decreased concentration, lack of stamina, weakness or fatigue and pain. He also stated that Plaintiff's chronic fatigue, sinusitis and asthma symptoms affected all of his activities of daily living. *Id.* Dr. Truong stated that at least 6 of the 10 chronic fatigue syndrome diagnostic criteria were met. AR 724 . He concluded that Plaintiff's "chronic fatigue is most likely the result of his chronic and recurrent rhinosinusitis, asthma, and sleep apnea. This is also based on the knowledge that fatigue is one of the most common symptoms in those chronic problems." AR 728. He stated that the chronic fatigue could not be related to Plaintiff's "Epstein Barr antibody positively without resorting to mere speculation." *Id.*

**E.    Medical Records and Reports.**

**1. St. Rose Dominican Hospital.** Plaintiff was hospitalized for chest pains at St. Rose Dominican Hospitals in July 2008. The "History of Present Illness" stated:

9

1

2

3

4

5

6

7

8

> The patient is a 45-year-old gentleman with a history of chronic persistent asthma, chronic sinusitis with a history of multiple sinus surgeries, and chronic cough.  The patient has been under treatment with Dr. Jim Christensen for years, has been sick this time since December, and has been tried on multiple different antibiotics and steroids.  The last time he was on steroids was about two weeks ago.  He has this chronic cough and decondition, and has poor exercise tolerance with shortness of breath.  He came in with recent new-onset chest pain on the left side with left arm numbness, mostly at night, and is recurring every night, and so was told by his wife to come in.  The patient denies any nausea or vomiting. . . . The patient does have sleep apnea, but according to him had multiple sleep studies done and does not meet the criteria for CPAP or BIPAP at this time.  The patient has chronic fatigue, likely a steroid side effect, and is really concerned.

9

   AR 590.

10

   On July 12, 2008, an MRI of Plaintiff's lumbar spine was obtained which revealed a very

11

mild broad base disk bulge at L4-L5, "but no significant compromise of the canal or foraminal is

12

seen."   AR 582-583.  The MRI also revealed a small broad based disk protrusion at L5-S1, "which

13

is mostly central indenting the thecal sac but causing no significant canal stenosis."  AR 583.

14

   **2.  Dr. James Christensen/Pulmonary Associates.**  Dr. James Christensen was

15

Plaintiff's principal treating physician for his allergy/sinus problems.  The record includes Dr.

16

Christensen's office visit notes and treatment records from June 5, 2007 through October 25, 2010.

17

AR 820-860, 1028-1040.  Dr. Christensen's notes do not provide narrative detail regarding

18

Plaintiff's complaints or examination findings.  His handwritten notes are also illegible.  *See e.g*

19

AR 820-823.

20

   Dr. Christensen wrote a January 21, 2010 letter addressed "To Whom It May Concern" in

21

which he stated as follows:

22

23

24

25

26

> Please be advised that I have seen Mr. Mandler since 12/16/97.  He has a history of recurrent pneumonias in the Navy and had recurrent sinus infections since being in the civilian world.  Part of these sinus infections started while he was in the Navy and he has had sinus surgery on four separate occasions before and after his discharge.  He is now stuck with an empty nose syndrome and recurrent sinusitis, be it either bacterial and/or fungal.  He has a chronic fatigue-like syndrome probably secondary to his chronic infections.  I have evaluated his immune system looking for an obvious immune deficiency.  There is nothing that is obvious.

27

28

> His quality of life has suffered dramatically.  He has chronic sinus infections on a regular basis.  We have tried oral antibiotics and IV

10

1
2
3
4

antibiotics.  We are having some success with inhaled topical antibiotics.  Unfortunately his sinuses are to the point that they don't support a natural mucociliary clearance system and he gets frequent infections from that.  He has frequent pneumonias from his sinustises and spends his time more on antibiotics rather than off.  He is also plagued by blinding headaches, nasal congestion, sore throat and a chronic cough.

5

AR 763.

6      On July 12, 2010, Dr. Christensen completed the licensed physician section of Plaintiff's

7  application for a disabled person's motor vehicle license plate or placard.  AR 1068.  Dr.

8  Christensen stated that Plaintiff cannot walk 200 feet without stopping to rest, that he was restricted

9  by lung disease and was permanently disabled.  *Id.*

10      **3. Dr. Ash Sharma/Diagnostic Center of Medicine.**  Plaintiff began treating with

11  Dr. Ash Sharma on November 11, 2008.  AR 916.  Dr. Sharma noted that Plaintiff had recently

12  been diagnosed with obstructive sleep apnea and had received a prescription for CPAP, but had not

13  yet started it.  *Id.*  Chronic sinusitis appeared to be the Plaintiff's main problem.  Plaintiff had

14  asthma "with patient reporting overall good control."  AR 915.  Dr. Sharma also assessed

15  obstructive sleep apnea, hypersensitive heart disease, well controlled on Micardis, HCTZ, and

16  GERD [Gastroesophageal reflux disease], well controlled on Protonix.  *Id.*  On December 4, 2008,

17  Dr. Sharma noted that Plaintiff was now using the CPAP machine for his obstructive sleep apnea

18  and he scheduled Plaintiff for follow-up in six months or as needed.  AR 914.  A handwritten note,

19  dated December 16, 2008 stated that Plaintiff reported a chief complaint of being "very fatigued,

20  had an episode on the 1st passed out after working out."  AR 914.  Dr. Sharma's office note for that

21  date, however, made no reference to this complaint and stated that Plaintiff is "here for follow up,

22  overall reports that he is doing well, taking all medications as prescribed."  Dr. Sharma did not

23  perform a physical examination, but did review results of laboratory studies.  Dr. Sharma noted

24  only a "mild exacerbation" of Plaintiff's sinusitis.  AR 913.  He noted that Plaintiff would be

25  started on Levaquin 500 mg daily.  He reviewed weight loss and dietary measures with Plaintiff and

26  scheduled further lab work.  *Id.*

27      On January 6, 2009, Dr. Sharma noted that "[t]he patient reports that for the most part he is

28  doing well.  He is here to review his most recent lab/diagnostics.  He offers no complaints."  AR

911. Dr. Sharma encouraged Plaintiff to work on weight loss and scheduled him for followup in three months.  On June 15, 2009, Dr. Sharma again noted that Plaintiff "[o]verall reports doing well and offers no complaint."  AR 909.  Dr. Sharma again deferred a physical examination.  He noted that Plaintiff's asthma was "stable with the patient using Combivent and Advair inhalers.  He also noted that Plaintiff's allergic rhinosinusitis was stable with the patient using Allegra D and Flonase nasal spray.  Plaintiff's steatohepatitis was improved with weight loss.  AR 909.  On July 22, 2009, Dr. Sharma noted that Plaintiff had had a sleep study on their initial visit and that Plaintiff was on CPAP.  Plaintiff reported that "he is using it faithfully every night, but he continues to have issues with general fatigue and hypersomnolence throughout the day.  The patient reports that he did have the appropriate CPAP titration and feels the sleep machine is working correctly."  AR 906.  Dr. Sharma again deferred a physical examination.  He adjusted Plaintiff's medications and scheduled him for followup in three months or as needed.  *Id.*

Plaintiff returned to Dr. Sharma on August 6, 2009.  AR 904-903.  The office visit note states:

> This is a very pleasant 47-year-old gentleman who presents today still very frustrated regarding his chronic fatigue issues.  The patient reports that he has severe weakness throughout his body, more extensively in the lower extremities.  The patient again related that this all started in November 2007.  The patient has been having increased and more frequent upper respiratory infections.  He had been followed by Dr. Christensen, who is an immunologist/allergist.  The patient reports that he was hospitalization (sic) and required inhaled tobramycin.  The patient reports that in November 2007 he was treated once again for URI.  The patient does provide a history of long standing asbestos exposure as he worked on a carrier in the military that was later noted to have severe asbestos exposure.  The patient brings in a copy of his government records showing his service connected disability.  The patient does note, however, that since that time he has had extreme fatigue that has only gotten progressively worse.  At this time the patient and I went over the differential of causes of fatigue which includes, but are not limited to sleep apnea, insomnia, stress, anxiety, depression, hypothyroid, anemia, chronic liver inflammation, or disease, chronic renal inflammation or disease, B12 deformity, folic acid deficiency, other vitamin deficiencies, medications, chronic respiratory conditions such as COPD, emphysema, asthma, restrictive lung disease and also chronic allergies as well as medication used to treat chronic allergies.

AR 904.

. . .

12

Dr. Sharma stated that he told Plaintiff that they had done a fairly extensive work up. Plaintiff stated that Dr. Christensen had followed him extensively for his chronic fatigue condition. Plaintiff denied any anxiety, insomnia, depression or stress.  AR 904.  Under Assessment, Dr. Sharma stated:

> CHRONIC FATIGUE, ETIOLOGY UNCLEAR WITH WORKUP AS NOTED.  Would still consider asthma, allergies, chronic respiratory condition.  In addition, I explained to the patient that he may have a diagnosis of chronic fatigue syndrome which has been related to Epstein-Barr virus infection.

AR 903.

Dr. Sharma referred Plaintiff to a pulmonologist for further evaluation.  He stated: "However, I made it very clear to the patient that his symptoms could be autoimmune, infectious, psychological, neurological, and at this time I have no clear indication of which route to take."  AR 903.

Dr. Sharma next saw Plaintiff on October 20, 2009.  He noted that since the last visit, Plaintiff had initiated several evaluations which included a naturopathic doctor.  Plaintiff indicated that he had been diagnosed with multiple allergies and had been started on a diet and measures to reduce his allergies.  The Plaintiff stated that having changed his diet and exposure, "he has seen significant improvement of his sinus allergies and in part from this improvement of his chronic fatigue issues."  AR 901.  Plaintiff also reported that his CPAP had been increased to 10 cm of water and he felt that the higher pressure over the last few days may also help his chronic fatigue. *Id.*  Plaintiff reported continued issues with memory which he attributed to fatigue.  Although Plaintiff felt some improvement in his fatigue, he stated that he would like a neurological workup to rule out other causes.  *Id.*  Dr. Sharma saw Plaintiff on December 7, 2009, at which time Plaintiff reported that he had been evaluated by Dr. Christensen who felt the majority of his fatigue symptoms may be due to his sinuses.  Dr. Christensen recommended that Plaintiff be seen at the UCLA sinus center for further evaluation and treatment options.  Dr. Sharma indicated that he would refer the Plaintiff to the UCLA Sinus Center and Neurology and would follow up with him thereafter.  AR 899.

. . .

Dr. Sharma saw Plaintiff on March 15, 2010, after he had completed his evaluations at

UCLA.  Dr. Sharma stated:

> Overall evaluation was that ENT reported the patient was having chronic sinusitis with recommendation of aggressive antibiotic therapy.  Neurology evaluated the patient with a working diagnosis of possible benign essential tremor, question of sleep disturbance, with the patient having good sleep efficiency of 86%.  However, the patient had decreased delta sleep on the CPAP which he is on currently.  There was also a question of depression and anxiety, thyroid disease.

AR 897.

Under A/P (assessment and plan), Dr. Sharma stated:

> 1.   CHRONIC FATIGUE starting two to two and a half years ago after the patient had an episode of severe pneumonia in conjunction with a diagnosis of mononucleosis, with the patient reporting both mental and physical fatigue. To this point, the patient has failed improvement with trials of Nuvigil, phentermine.  The patient is being treated for his allergies, chronic sinusitis by Dr. Christensen as well as ENT at UCLA.
>
> 2.   OBSTRUCTIVE SLEEP APNEA ON CPAP, although there is some question that the patient is having quality sleep, with the patient referred to sleep specialist at UCLA for follow up.
>
> 3.   CHRONIC RHINOSINUSITIS FOLLOWED BY ALLERGIST AS WELL AS ENT AT UCLA.

AR 897.

On May 10, 2010, Dr. Sharma noted:

> The patient returns today reporting that he thinks he is doing much better with regards to his chronic issues of fatigue and mental status issues.  The patient reports that he did get a new and improved mask for his CPAP which seems to be working much better.  The patient still has a followup appointment with the sleep specialist at UCLA which will be occurring on Monday 5/17.  The patient is hopeful that correcting his sleep apnea is the key to his improvement.  The patient also feels that when he was diagnosed approximately two years ago with mononucleosis the doctor at the time informed the patient that he would probably have a two year recovery period.  The patient reports that he has hit the two year mark and is feeling better.

AR 895.

On June 15, 2010, Dr. Sharma noted that "[o]verall the patient reports he is stable with his

chronic symptoms of fatigue." AR 893.  Plaintiff stated that he had done research about his

14

condition and "has come to the conclusion that for the most part he is having chronic fatigue secondary to the EBV infection he had two years ago." *Id.* Plaintiff also reported that "his chronic sinus symptoms seem to be relatively well-controlled." *Id.* Under A/P (assessment and plan), Dr. Sharma stated:

> 1. CHRONIC FATIGUE with the patient having had extensive workup. To date the patient has been noted to have antibodies to Epstein-Barr infection. The patient had an Epstein-Barr infection with the onset of symptoms. Workup has found the patient to have no other underlying cause of his fatigue. The patient does have a history of obstructive sleep apnea which is now being treated with CPAP.

AR 893.

**4. Dr. John Pinto.** Plaintiff saw John F. Pinto, M.D. on September 15, 2009 regarding his complaint of "[p]ersistent daytime sleepiness in spite of use of CPAP." AR 667. Dr. Pinto stated that several factors might be considered, including Plaintiff's problems with allergic rhinitis and medication. He noted that Plaintiff had had "no fewer than 5 different operations" for his sinuses and that "[t]his particular sinus problem disrupts people without sleep apnea and with him using nasal pillows for his CPAP machine." AR 667.

Dr. Pinto referred Plaintiff for another sleep study which was performed on November 17, 2009. The Clinical Polysomnographer reported:

> Patient currently complains of chronic fatigue after recently being diagnosed with OSA [Obstructive Sleep Apnea], and following last nights full night PSG on CPAP at his current setting of 10 cwp, obtaining validation of optimal treatment of his SDB. The patient's mean sleep latency of 14.5 minutes places him in the normal category. No sleep onset REM periods were seen on 5 naps conducted at 2 hour intervals following his previous nights study. This MSLT, and the preceding nights study with the patient on his current cpap setting of 10 cwp does not appear to shed further light on his claimed idiopathic fatigue.

AR 672.

Dr. Pinto saw Plaintiff on November 25, 2009 and stated that "with regard to this patient's shortness of breath, he is currently on Advair 500/50 mcg in conjunction with Combivent. On these two medications, his pulmonary functions are entirely within normal limits." AR 662. Dr. . . .

15

Pinto also noted that the current CPAP study "shows that he is quite stable on his current setting of 10 cm of CPAP. He further commented:

> In essence, it is not his sleep apnea nor his asthma that is affecting his shortness of breath or symptoms of chronic fatigue. Currently, he is in the process of obtaining the neurology consultation and he will be returning to Dr. Ash Sharma for further followup.
>
> Of note is the fact that this patient mentions that Nuvigil and Provigil have had no effect on his fatigue.
>
> I suggested that perhaps one of his problems might be chronic depression, but I will leave that particular diagnosis to people more capable of making that diagnosis.

AR 662.

**5. Dr. Joel Sercarz/UCLA Healthcare.** Plaintiff was seen by Joel Sercarz, M.D., UCLA Healthcare on January 22, 2010 for an evaluation of his sinus condition. After summarizing Plaintiff's medical history, Dr. Sercarz stated:

> Mr. Mandler has severe sinus symptoms despite having had multiple sinus operations and patent sinus cavities. Because there was no obstruction to his sinus outflow and no significant soft tissue, I do not recommend surgery in this setting. Likewise, he has had long-term use of oral antibiotics and this has not led to a reduction in his symptoms.
>
> This is a difficult clinical problem with no obvious effective solutions. After a long discussion with him, I feel that adequate humidification of his nasal cavity and the use of aerosolized antibiotics would be the best treatment at this time. . . . I have recommended that he undergo a vancomycin therapy for the time being. Thereafter, he should be managed expectantly. Some patients also benefit from topical steroids through the nebulizer and/or antifungal therapy.

AR 692-693, 742-743.

**6. Dr. Molly Johnston, UCLA Medical Center.** Molly Johnston, M.D. saw Plaintiff on February 23, 2010 for a neurological evaluation. Dr. Johnston noted that Plaintiff was diagnosed in December 2008 with obstructive sleep apnea "and started on CPAP which he wears from 10:30 p.m. until 6 a.m. However, he does not sleep the whole time. He endorses that he does not feel rested when he wakes up and still has daytime somnolence. Additionally, in the past 6 months, he has noted a sense of uneasy tremulousness in his whole body although he does not notably see a tremor in his hands or head. He states that it has not gotten better or worse, does not

1  notice anything that exacerbates it, despite having a 2-week prescription of Provigil in December

2  2009 of 150 mg as well as phentermine 37.5 mg a day for 1 week in January 2010, for weight loss."

3  AR 744.  Plaintiff reported that the medications did not help his weight loss or somnolence.  He

4  also stated that when the drug wore off, he would be so tired he needed more sleep.  *Id.*  Plaintiff

5  stated that he did not feel depressed.

6     Under Assessment, Dr. Johnston stated that "[f]or his initial concern of inner body shaking,

7  on exam, he had a very fine tremor on outstretched hand consistent with early benign essential

8  tremor which is likely enhanced by caffeine, his asthma medications, and potentially anxiety,

9  consistent with his inner sense of uneasiness.  On examination, the doctor found that Plaintiff had

10  hyperreflexia which made it prudent to check for hyperthyroidism.  Dr. Johnston stated that a

11  thyroid disorder could also explain part of Plaintiff's chronic fatigue.  She further stated:

12     However, more pertinent is his sleep apnea.  He has had several sleep
       studies in the past.  His most recent of which states a normal
13     multisleep latency test with good sleep efficiency at 86% although
       increased stage 1 and 2 at the expense of the delta.  Despite his usage
14     of CPAP, he still has hypersomnolence during the day and wakes up
       not feeling rested.  Other considerations would be depression,
15     anxiety, possibly contribution from asthma medications as well.

16  AR 745.

17     Dr. Johnston referred Plaintiff to a UCLA sleep study specialist for a second opinion on his

18  prior sleep studies.  AR 745.

19     **7. Dr. Gerald Frank, UCLA Health System, Department of Pulmonary**

20  **Medicine.**  Plaintiff saw Gerald Frank, M.D. on January 19, 2011 for a pulmonary consultation.

21  Plaintiff told Dr. Frank that "a diagnosis of black mold was made in his house and some of his

22  symptoms were ascribed to that."  AR 1078.  Dr. Frank noted that Plaintiff had recurrent sinusitis,

23  occasional skin rashes, exertional dyspnea, nonproductive cough, daytime hypersomnolence, chest

24  heaviness, heartburn, fatigue, frequent headaches, anxiety and insomnia.  *Id.*  Plaintiff's physical

25  examination was unremarkable.  AR 1079.  Under assessment, Dr. Frank stated that Plaintiff had

26  asthma by history, "now apparently well controlled," sleep apnea, "however, the patient remains

27  with daytime hypersomnolence," chronic sinusitis and history of possible viral illness.  Dr. Frank

28  noted that "he was referred to UCLA Infectious Disease who refused to see him" and had been seen

by Dr. Avedon at UCLA who ordered a sleep study which was not done.  Dr. Frank stated that he would arrange to have Plaintiff rescheduled for another sleep study.

**8. Dr. Leo Germin, Clinical Neurologist.**  Plaintiff saw Leo Germin, M.D. for a neurological consultation on March 9, 2011.  Plaintiff also told Dr. Germin about black mold in the house in which he previously resided and that his symptoms had improved slightly since moving from that house.  AR 1070.  Plaintiff complained of chronic fatigue, sinus infection, as well as allergic rhinitis.  He stated that he had tried and failed a number of medications such as Provigil without relief.  *Id.*  He stated that at times "his whole body feels like a wet noodle where he has to lay down and sleep."  *Id.*  Plaintiff denied any overt confusion associated with chest pain, or palpations, syncope, or near syncopal episodes.  *Id.*  He complained of tremor in both hands, both with rest and activity.  *Id.*  He also "has difficult time with comprehension."  AR 1071.  Dr. Germin's physical and neurological examinations of Plaintiff were unremarkable and he did not recommend any particular treatment.  AR 1072-1073.

**9. Dr. Alon Avidan, UCLA Sleep Disorders Center.**  Dr. Avidan conducted a sleep study on Plaintiff on May 13, 2011 and reported on the results as follows:

> The study demonstrates obstructive sleep apnea associated with 02 desaturation down to 83% from baseline of 94-96%.  Since the patient met our split night protocol criteria, CPAP was initiated and completed.  CPAP pressure of 9 cm H20 effectively improved sleep apnea during supine-REM sleep and stabilized oxygen saturation at 96-98%.  The rest of the physiological parameters including EKG, EMG and EEG were normal.
>
> Diagnosis: Axis I: Obstructive sleep apnea, 327.23.  Hypersomnia with sleep apnea, Unspecified, 780.53.  Hypersomnia Unspecified. 780.54.  Axis II: Split-night Protocol; baseline and CPAP Titration study, 95811.

AR 1077.

Dr. Avidan recommended a CPAP setting of 9 cm.  He stated that Plaintiff should not drive when sleepy and should avoid long-acting sedatives, hypnotics and alcohol.  *Id.*

**10. Dr. Raji Venkal.**  Plaintiff was seen by Dr. Raji Venkal on June 15, 2011, who noted that Plaintiff was transferring to his care from Dr. Sharma.  AR 1087.  Dr. Venkal noted that Plaintiff had lost 32 pounds through diet.  *Id.*  Plaintiff provided a medical history consistent with

his reports to prior physicians.  *Id.*  Dr. Venkal noted Plaintiff's prior history of sinus issues and sleep problems and that Plaintiff reported "overall improvements but still having problems sleeping.  Plaintiff started taking flurazepam and it helps him fall asleep but he can't stay asleep."  AR 1087.  Plaintiff stated that he "has had sleeping problems ever since he was young, says he always slept for 4 hours now he has been dxed with sleep apnea, he sleeps for 5 hrs, feels like he does not get enough sleep, wakes up and feels tired, he has lost some weight recently with HCG diet and he feels more fatigued, he is taking only 500 calories, he is worried about his health a lot . . . ."  AR 1088.  The Plaintiff also had some recent abnormal blood work results which concerned him.  *Id.*

**11.  State Agency Consultants.**  State Agency consulting physician, Elsie Villafor, M.D., prepared a Physical Residual Functional Capacity Assessment of Plaintiff on March 15, 2011.  She found that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, could stand/walk 6 hours in an 8-hour workday, could sit 6 hours in an 8-hour workday, had unlimited ability to push and pull, could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, never climb ropes, ladders or scaffolds, had no limitations for reaching, handling, fingering, or feeling, no visual limitations, no communication limitations, and should avoid concentrated exposure to extreme cold or heat, fumes, odors, dust, gases, poor ventilation and to hazardous machinery or heights.  AR 1056-1063.

State Agency consulting psychologists, Pastora Roldan, Ph.D. and Jack Araza, Ph.D. prepared  "Psychiatric Review Techniques," on September 16, 2010 and March 11, 2011, respectively.  Both psychologists found that Plaintiff had no medically determinable mental impairment.  AR 1042-1055.

**III.     The ALJ's Decision**

In his decision dated February 29, 2012, ALJ David Gatto found that Plaintiff was not disabled, as defined in the Social Security Act, from June 1, 2008 through the date of his decision.  AR 39.  The ALJ followed the five-step sequential evaluation process established by the Social Security Administration.  20 CFR 404.1520(a).  At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013 and that he had

1   not engaged in substantial gainful activity (SGA) since July 1, 2008.  AR 34.

2   At step two, the ALJ found that Plaintiff had the following severe impairment: chronic

3   sinusitis, status post multiple surgeries.  AR 34.  He noted that all of Plaintiff's medical

4   determinable impairments, even those which are not severe, must be considered at each step of the

5   sequential evaluation process.  The ALJ stated that "[t]he claimant also alleges suffering from sleep

6   apnea, asthma, chronic fatigue syndrome, Epstein-Bar virus (sic), chronic pneumonia, and low back

7   pain.  However, the record reveals that these impairments do not cause more than a minimal effect

8   on his ability to function."  AR 34-35.  The ALJ noted that Plaintiff was diagnosed with sleep

9   apnea in 2008, but that he reported improvement in his symptoms with CPAP therapy.  AR 35.

10   Plaintiff's asthma was well controlled with medication.  Although the Plaintiff alleged that he has

11   shortness of breath, laboratory studies consistently revealed normal spirometric values.  *Id.*

12   In regard to Plaintiff's chronic fatigue syndrome, the ALJ stated as follows:

13   [T]he record does not contain any objective finding that supports his
    subjective complaints of chronic fatigue syndrome.  Dr. Ash Sharma

14   noted that the cause behind the claimant's alleged chronic fatigue
    syndrome remains unknown despite work-up, and his chronic fatigue

15   work-up has been negative.  Moreover, the claimant reported
    significant improvement in his chronic fatigue after making dietary

16   changes and exercising.

17   AR 35.

18   With respect to the Epstein-Barr virus and mononucleosis, the ALJ stated that Plaintiff "has

19   sought very little treatment for symptoms related to Epstein-Bar virus," and reported feeling better

20   once he reached to the 2 year mark after his diagnosis.  AR 35.  As to chronic pneumonia, the ALJ

21   noted that the record revealed consistently normal chest x-rays with no evidence of any disease.  He

22   also noted the absence of any treatment for alleged bouts of chronic pneumonia.  *Id.*  With respect

23   to Plaintiff's low back pain, the ALJ stated that the July 2008 lumbar spine MRI revealed only mild

24   degenerative changes and that Plaintiff had sought and received very little treatment for low back

25   pain.  The treatment notes also revealed normal examination findings, and Plaintiff failed to

26   mention disabling low back pain on his numerous visits to treating physicians.  AR 35.  The ALJ

27   therefore found that "the claimant's sleep apnea, asthma, chronic fatigue syndrome, Epstein-Bar

28   (sic) virus, chronic pneumonia, and low back pain have not resulted in any significant limitation in

his ability to do basic work activities," and were, therefore, "non-severe impairments" for purposes of his decision.  AR 35.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CRF Part 404, Subpart P, Appendix 1.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to do light work as defined in 20 C.F.R. § 404.1567(b), with the limitations noted by Dr. Villafor in her physical residual functional capacity assessment.  AR 36.  In making this determination, the ALJ noted that Plaintiff underwent multiple surgeries for his chronic sinusitis which suggested that Plaintiff's symptoms were genuine.  The records, however, reflected that the "surgery was generally successful in relieving the symptoms."  AR 36.  A March 2008 CT scan of the sinuses revealed stable post-surgical changes, with no new disease identified.  The ALJ also cited Dr. Sharma's 2009 and 2010 office visit notes in which Plaintiff reported that he was doing well with no complaints, that his sinus symptoms were well controlled with medication, and that he also experienced improvement with dietary change and exercise.  AR 37.   The ALJ also noted that Plaintiff's post-surgical treatment for his sinuses was essentially routine and conservative in nature. *Id.*

The ALJ discounted Dr. Christensen's opinion that Plaintiff's "quality of life had suffered dramatically due to multiple symptoms caused by his history of recurrent pneumonia and recurrent sinus infections, status post multiple surgeries."  AR 37.  The ALJ stated that Dr. Christensen failed to provide specific limitations and his opinion was inconsistent with the record as a whole, and without substantial support from other evidence in the record.  The ALJ also speculated that Dr. Christensen's opinions may have been motivated by sympathy or he may have been pressured to provide an opinion favorable to Plaintiff's disability claim.  *Id.*

The ALJ stated that a VA disability rating must be considered and is ordinarily entitled to great weight, but may be rejected or given lesser weight if the ALJ gives persuasive, specific and valid reasons for doing so which are supported by the record.  AR 37.  In declining to accept the VA's disability determination regarding Plaintiff, the ALJ stated:

1
2
3
4
5
6
7
8

> I do not afford great weight to the VA disability finding that the claimant is 100% disabled.  First of all, the objective medical evidence record reveals that the claimant's chronic sinusitis while severe, is not so severe as to be disabling.  As discussed above, the claimant reported improvement in his chronic sinusitis with treatment, and dietary change and exercise (citations to record omitted).  As for the claimant's asthma, viral pneumonia, and sleep apnea, which the VA evaluated to be 60 % disabling, the evidence shows that the claimant's asthma remains well controlled with medication, and he consistently had normal spirometric values.  The claimant's chest x-rays were normal with no evidence of cardiopulmonary disease. (citations to record omitted).  Additionally, the claimant's sleep apnea improved with CPAP therapy and he had good sleep efficiency, normal sleep, and REM latency, as well a (sic) normal polysomnogram.  (citations to record omitted).

9

AR 38.

10      The ALJ also found that Plaintiff's statements and testimony regarding the severity of his

11  symptoms and functional limitations were "disproportionate to the objective findings of the

12  medical record, inconsistent with the medical opinion evidence, exaggerated and not fully

13  credible."  AR 38.   The ALJ stated that "claimant has provided various inconsistent statements

14  regarding his symptoms and limitations.  He testified he is unable to work due to chronic sleep

15  deprivation caused by his sleep apnea: however moments later, he testified he spends most of his

16  day sleeping.  Also despite alleging chronic headaches due to his chronic sinusitis, he failed to even

17  mention his headaches during his testimony."  AR 38.  The ALJ further stated that Plaintiff's

18  statement that his chronic fatigue and chronic sinusitis severely affects his ability to perform

19  activities of daily living was inconsistent with other statements that he was able to perform daily

20  activities.  The ALJ stated that Plaintiff "reported that he does his own laundry twice a week, and

21  only alleged minimal problems with his personal care."  Id.  The ALJ also stated that Plaintiff's

22  statements that the many medications for his chronic fatigue and sinusitis all failed was inconsistent

23  with the objective treatment records.  Id.

24      Based on his determination of Plaintiff's residual functional capacity, the ALJ found at step

25  four that Plaintiff was capable of performing past relevant work as an executive director, sedentary,

26  skilled, timeshare sales, sedentary skilled, and insurance sales, light, skilled.  AR 38-39.

27  . . .

28  . . .

**DISCUSSION**

**I.    Standard of Review**

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). The court "may not affirm simply by isolating a 'specific quantum of supporting evidence." *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012), quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the district court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision. *Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981) (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the district court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In the alternative, the district court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.    Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that (a) he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).  The claimant has the initial burden of proving disability.  *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Tackett v. Apfel*, 1180 F.3d at 1098.  Social Security disability determinations are made by following the five step sequential evaluation process set forth in 20 C.F.R. § 416.920 and discussed in numerous decisions.  Those steps are set forth in the ALJ's decision, AR 33, and will not be repeated here.

## III.    Analysis and Findings

Plaintiff makes two arguments for reversal.  First, Plaintiff argues that the ALJ did not provide persuasive, specific, and valid reasons for not according great weight to the VA's disability determination. *Motion for Reversal (Dkt. #14) pgs. 5-8.*  Second, Plaintiff argues that the ALJ

1    failed to properly consider the "testimony" of Plaintiff's daughter as set forth in her August 1, 2010

2    Third Party Function Report. *Id., pgs. 8-11.* The Commissioner responds to these arguments by

3    asserting that the ALJ set forth sufficient reasons for not according great weight to the VA's

4    disability determination. The Commissioner also argues that it was unnecessary for the ALJ to

5    address Ms. Mandler's statements because his reasons for rejecting the credibility of Plaintiff's

6    testimony were also sufficient to reject the statements of his daughter.

7            In *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir.2002), the Ninth Circuit held "that

8    although a VA rating of disability does not necessarily compel the SSA to reach an identical result,

9    20 C.F.R. §404.1504, the ALJ must consider the VA's findings in reaching his decision." The

10   court joined the Fourth, Fifth and Eleventh Circuits in holding "that in an SSD case an ALJ must

11   ordinarily give great weight to a VA determination of disability." The court further stated:

12              We so conclude because of the marked similarity between these two
                federal disability programs. Both programs serve the same
13              governmental purpose—providing benefits to those unable to work
                because of a serious disability. Both programs evaluate a claimant's
14              ability to perform full-time work in the national economy on a
                sustained and continuing basis; both focus on analyzing a claimant's
15              functional limitations; and both require claimants to present
                extensive medical documentation in support of their claims.
16              *Compare* 38 C.F.R. § 4.1 et seq. (VA ratings) *with* 20 C.F.R. § 404.1
                et seq (Social Security Disability). Both programs have a detailed
17              regulatory scheme that promotes consistency in adjudication of
                claims. Both are administered by the federal government, and they
18              share a common incentive to weed out meritless claims. The VA
                criteria for evaluating disability are very specific and translate easily
19              into SSA's disability framework. Because the VA and SSA criteria
                for determining disability are not identical, however, the ALJ may
20              give less weight to a VA disability rating if he gives persuasive,
                specific, valid reasons for doing so that are supported by the record.
21              *See Chambliss,* 269 F.3d at 522 (ALJ need not give great weight to a
                VA rating if he "adequately explain[s] the valid reasons for not doing
22              so").

23           298 F.3d at 1076.

24           In *Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 695 (9th Cir. 2009), the

25   court held that "the ALJ was justified in rejecting the VA's disability rating on the basis that she

26   had evidence the VA did not, which undermined the evidence the VA did have." More

27   specifically, the court noted that the ALJ properly rejected the opinion of the claimant's treating

28   psychologist who repeatedly stated that plaintiff was unemployable while acknowledging that he

1    was continuing to work full time.  The psychologist's own treatment records showed that the

2    claimant had improved functioning at work and received encouraging comments from his

3    supervisors.  *Id.*, 574 F.3d at 692-93.  The ALJ also noted that the claimant's post-retirement

4    activities, including gardening and community activities, were inconsistent with his claims that he

5    was unable to work.  *Id.*, at 693.

6        In *Berry v. Astrue*, 622 F.3d 1228, 1236 (9th Cir. 2010), the ALJ gave three reasons for

7    discounting the VA disability determination.  The court rejected the ALJ's first reason which was

8    that the SSA was not bound by the VA's determination because the governing rules differ.  The

9    court stated that under *McCartey,* this was not a proper reason for rejecting the VA disability

10   determination. The court also found that the ALJ erred in rejecting the VA's determination that

11   potential employers would not hire the claimant as a driver or courier because of his inability to

12   pass a drug test.  The court, however, upheld the ALJ's third reason for rejecting the VA disability

13   determination.  The court stated:

14           [T]he ALJ reviewed in detail medical records related to Berry's sleep
             apnea and back pain. The medical records on which the ALJ relied
15           specifically support his conclusion that Berry's sleep apnea had
             improved since the VA's disability determination and was well
16           controlled by the prescribed treatment, resulting in "minimal
             functional limitations due to sleep apnea" by the time the hearing
17           occurred. They also support the ALJ's conclusion that Berry's
             pain—as distinct from the effects of medication to control that
18           pain—was adequately controlled with medications so as not to be
             completely disabling. The ALJ's assessment of these specific records
19           is both persuasive and valid. We therefore conclude that the ALJ's
             reasons for disagreeing with the VA about the disabling effects *of*
20           *these particular impairments* are sufficiently "persuasive, specific,
             valid [and] supported by the record." *Valentine,* 574 F.3d at 695
21           (quoting *McCartey,* 298 F.3d at 1076) (internal quotation marks
             omitted). They do not, however, represent a complete basis for
22           discounting the VA's disability determination. Accordingly, the ALJ
             on remand should reconsider with appropriate deference the effect, if
23           any, of the other bases for the VA's disability determination.

24       622 F.3d at 1236.

25       In this case, the VA determined that Mr. Mandler suffers from chronic fatigue syndrome,

26   and it was primarily the effects of that impairment–fatigue, weakness, daytime somnolence,

27   headaches, and memory/concentration deficits– that, in the opinion of the VA, disabled Plaintiff

28   from working.  AR 207-208, 721-723.  Plaintiff, himself, testified at the February 13, 2012 hearing

26

that the main things that prevent him from working are "chronic fatigue and sleep deprivation." AR 49.  When asked which of his conditions would specifically prevent him from working, Plaintiff stated:  "The chronic fatigue, the sleep deprivation, the – pretty much chronic fatigue and sleep deprivation.  The walking, I can't do prolonged walking."  AR 55-56.

The ALJ found that Plaintiff's alleged chronic fatigue syndrome was not a "severe impairment" at step two of the sequential process because "the record does not contain any objective finding that support (sic) his subjective complaints of chronic fatigue syndrome." AR 35. The ALJ cited Dr. Sharma's statement that "the cause behind claimant's alleged chronic fatigue syndrome remains unknown despite work-up and his chronic fatigue work-up has been negative." *Id.*  The ALJ, however, did not discuss the VA's finding that Plaintiff was 60% disabled due to chronic fatigue syndrome.

The ALJ's finding that Plaintiff's chronic fatigue syndrome was not a "severe impairment is both contrary to law and the record.  The severity inquiry at step two of the sequential process is "a de minimis screening device to dispose of groundless claims."  *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996); *Webb v. Barnhart,* 433 F.3d 683, 686–87 (9th Cir. 2005).  An impairment can be found "not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  *Id.*  Although Dr. Sharma stated that the etiology of Plaintiff's chronic fatigue was unclear, he diagnosed Plaintiff as suffering from this condition.  Dr. Sharma listed "Chronic Fatigue, Etiology Unclear with Workup as Noted" as a diagnosis in his August 6, 2009 note.  He further stated:  "In addition, I explained to the patient that he may have a diagnosis of chronic fatigue syndrome which has been related to Epstein-Barr virus infection."  AR 903.  He also listed "chronic fatigue" as a diagnosis in his March 15, 2010 note, stating that it started "two to two and a half years ago after the patient had an episode of severe pneumonia in conjunction with a diagnosis of mononucleosis, with the patient reporting both mental and physical fatigue."  AR 897.  On June 15, 2010, Dr. Sharma listed "chronic fatigue" as his first diagnosis "with patient having had extensive work up."  AR 893.  Other physicians noted that Plaintiff's complaints of chronic fatigue could not be explained by his asthma or sleep apnea, and was of undetermined causation.  AR 662 (November 25, 2009 office note of Dr. Pinto); and

27

AR 745 (February 23, 2010 neurological Evaluation by Dr. Molly Johnston).  The ALJ also made no reference to the reports of VA medical examiner, Dr. Truong, who confirmed a diagnosis of chronic fatigue syndrome based on his evaluation of the medical records and his examination of Mr. Mandler.  AR 721-724.

The ALJ failed to recognize that the absence of a clear etiology for a patient's complaints of chronic fatigue is a hallmark of chronic fatigue syndrome.  Thus, Dr. Sharma's statements regarding the unknown or unclear etiology for Plaintiff's symptoms is consistent with, rather than contrary to a diagnosis of chronic fatigue syndrome.  The ALJ did not discuss Social Security Ruling (SSR) 99-2p, 1999 WL 371569 (S.S.A. April 30, 1999), which specifically addresses the evaluation of cases involving chronic fatigue syndrome (CFS).[1]  SSR 99-2p states:

> CFS is a systemic disorder consisting of a complex of symptoms that may vary in incidence, duration and severity.  The current case criteria for CFS, developed by an international group convened by the Centers for Disease Control and Prevention (CDS) as an identification tool and research definition, include a requirement for four or more of a specified list of symptoms.  These constitute a patient's complaints as reported to a provider of treatment.  However, the Social Security Act (the Act) and our implementing regulations require that an individual establish disability based on a medically determinable impairment; i.e., one that can be shown by medical evidence consisting of medical signs, symptoms and laboratory findings.  Disability may not be established on the basis of an individual's statements of symptoms alone.

1999 WL 371569, at *1.

SSR 99-2p states that CFS constitutes a medically determinable impairment when it is accompanied by medical signs or laboratory findings:

> Under the CDC definition, the hallmark of CFS is the presence of clinically evaluated, persistent, or relapsing chronic fatigue that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social or personal activities.  Additionally, the current CDC definition of CFS requires the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred

_____

[1] SSR 99-2p was rescinded and replaced by SSR 14-1p, effective April 3, 2014.  *See* www.socialsecurity.gov/OP_Home/rulings/di/01/SSR 2014-... (accessed on 3/2/2015).  SSR 14-1p is substantially similar to SSR 99-2p.

during 6 or more consecutive months of illness and must not have predated the fatigue:

>self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social or personal activities;

>sore throat;

>tender cervical or axillary lymph nodes;

>muscle spasm;

>multi-joint pain without joint swelling or redness;

>headaches of a new type, pattern, or severity;

>unrefreshed sleep[2]; and

>postexertional malaise lasting more than 24 hours.

*Id.*, at *1-*2.

The ruling further states that "[w]ithin these perameters, an individual with CFS can also exhibit a wide range of other manifestations, such as muscle weakness, swollen underarm (axillary) glands, sleep disturbances, visual difficulties (trouble focusing or severe photosensitivity), orthostatic intolerance (e.g. lightheadedness or increased fatigue with prolonged standing), other neurocognitive problems (e.g., difficulty comprehending and processing information), fainting, dizziness, and mental problems (e.g., depression, irrtability, anxiety.)"

SSR 99-2p further states that certain medical signs and laboratory findings can establish the existence of a medically determinable impairment in individuals who have CFS. The ruling notes that although no specific etiology or pathology has yet been established for CFS, many research initiatives continue. "With continuing scientific research, new medical evidence may emerge that will further clarify the nature of CFS and provide greater specificity regarding the clinical and laboratory diagnostic techniques that should be used to document this disorder." The ruling lists nonexclusive examples of signs or symptoms and laboratory findings that will establish the

---

[2] SSR 14-1p uses the term "waking unrefreshed" which it states can be shown in the case record by a person's reports that describe a history of non-restorative sleep, such as statements about waking up tired or having difficulty remaining awake during the day. *Id.*, note 15.

existence of a medically determinable impairment.  *Id.*, at *2-*3.  The ruling lists the following nonexclusive clinically documented signs or symptoms:

> palpably swollen or tender lymph nodes on physical examination;
>
> nonexudative pharyngitis;
>
> persistent, reproducible muscle tenderness on repeated examinations, including the presence of positive tender points; or
>
> any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case records.[3]

*Id.*, at *3.

SSR 99-2p lists the following laboratory findings:

> an elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640;
>
> an abnormal MRI brain scan;
>
> neurally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing; or
>
> any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with other evidence in the record; for example an abnormal exercise stress test or abnormal sleep studies, appropriately evaluated and consistent with other evidence in the case record.

*Id.*, at *3.

SSR 99-2p states that "if an adjudicator concludes that an individual has a medically determinable impairment, and the individual alleges fatigue, pain, symptoms of neurocognitive problems or other symptoms consistent with CFS, these symptoms must be considered in deciding whether the individual's impairment is 'severe' at step 2 of the sequential evaluation process and at later steps reached in the sequential process." *Id.*, at *4.  The ruling noted that "[i]nasmuch as CFS is not a listed impairment, an individual with CFS alone cannot be found to have an impairment that meets the requirement of a listed impairment; however, the specific findings in each case

---

[3] SSR 14-1p lists as additional medical signs or symptoms: frequent viral infections, sinusitis, ataxia, extreme pallor, and pronounced weight change.  The record establishes that Mr. Mandler suffered from frequent viral infections and sinusitis.  He also experienced weight changes, although the weight changes may have been due to his dieting efforts.

30

should be compared to any pertinent listing to determine whether medical equivalence may exist."

*Id.*  In cases where an individual with CFS has psychological manifestations related to CFS, "consideration should always be given to whether the individuals's impairment meets or equals the severity of any impairment in the mental disorders listings in 20 CFR, part 404, subpart P, appendix 1, sections 12.00 ff. or 112.00 ff." *Id.*, at *5.

SSR 99-2p requires an adjudicator to consider the individual's chronic fatigue symptoms in deciding how such symptoms may affect his functional capacities.  The ruling also noted that the medical signs and symptoms of CFS fluctuate in frequency and severity and often continue for a period of many months or years. *Id.*, at *5.  In cases where medical improvement in the claimant's CFS is anticipated, an appropriate continuing disability review should be scheduled. *Id.*, at *6. The ruling also discussed the general process for evaluating disability claims as applied to claims based on chronic fatigue syndrome. *Id.* *6-*8.  The ruling noted that in addition to medical reports and findings from acceptable medical sources, "[t]hird party information . . . may be very useful in deciding the individual's credibility." *Id.*, at *8.  This may include information from neighbors, friends, relatives or clergy. *Id.*

The VA medical examiner found that at least six of the ten chronic fatigue syndrome diagnostic criteria were met with respect to Plaintiff.  AR 724.  The record also shows that Plaintiff suffered from frequent viral infections and sinusitis which are an accepted sign or symptom of chronic fatigue syndrome as a medically determinable impairment under SSR 99-2p or SSR 14-1p. Plaintiff also has documented sleep apnea which supports a finding that his chronic fatigue syndrome is a medically determinable impairment.[4]

The medical records in this case, including the records of the VA medical examiner, establish that Plaintiff suffers from chronic fatigue syndrome and that it is a medically determinable impairment within the meaning of 42 U.S.C. §423(3), and 20 C.F.R. §§ 404.1508 and 416.908. The record also requires the conclusion that Plaintiff's chronic fatigue syndrome meets the

---

[4] Although Mr. Mandler was clinically evaluated for  Epstein-Barr virus in July 2008, the court has not found any reference to a laboratory report that shows "an elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640."

1  minimum threshold level of severity at step two of the sequential process. *See* 20 C.F.R. §416.(a)

2  (4)(ii) and *Webb v. Barnhart*, 433 F.3d at 686–87. The ALJ therefore clearly erred in finding that

3  Plaintiff's chronic fatigue syndrome was not a "severe impairment" at step two.

4  The fact that an impairment satisfies the threshold test of severity does not mean, however,

5  that it is disabling. "A claimant 'shall be determined to be under a disability only if his physical or

6  mental impairment or impairments are of such severity that he is not only unable to do his previous

7  work but cannot, considering his age, education, and work experience, engage in any other kind of

8  substantial work which exists in the national economy . . . .'" *Garrison v. Colvin*, 759 F.3d 995,

9  1010 (9th Cir. 2014), quoting 42 U.S.C. § 1382c(a)(3)(B). Because the ALJ failed to recognize that

10  Plaintiff's chronic fatigue syndrome was a severe impairment, however, he also failed to adequately

11  evaluate Plaintiff's alleged symptoms of debilitating fatigue, physical weakness, and impairments

12  in short term memory and concentration in assessing his residual functional capacity. In this

13  regard, the ALJ noted that Plaintiff's chronic sinusitis, asthma and sleep apnea were all well

14  controlled with medication, therapy, or diet. AR 38. He disregarded the evidence in the medical

15  records that despite some success in treating these conditions, Plaintiff continued to complain of

16  chronic fatigue and sleep deprivation-and associated impairments in his memory and concentration.

17  Other courts have reversed and remanded where the ALJ has failed to evaluate a plaintiff's claim of

18  disabling chronic fatigue syndrome in accordance with SSR 99-2p and where the evidence

19  supported a finding that plaintiff's chronic fatigue syndrome was a medically determinable

20  impairment that alone, or in combination with other impairments, was potentially disabling. *See*

21  *Dunn v. Astrue*, 2010 WL 2670851 (D.Me. June 28, 2010), affirmed at 2010 WL 2854439 (July 19,

22  2010) and *Dawes v. Astrue*, 2010 WL 2924092 (D.Me. July 19, 2010), affirmed at 2010 WL

23  3155159 (D.Me. August 9, 2010). More significantly in this case, by failing to evaluate Plaintiff's

24  chronic fatigue syndrome in accordance with SSR 99-2p, the ALJ also failed to set forth

25  persuasive, specific and valid reasons for not according great with to the VA's disability

26  determination which was based in substantial part on Plaintiff's chronic fatigue syndrome.

27  The ALJ also noted that Plaintiff reported significant improvement in his chronic fatigue

28  after making dietary changes and exercising as support for his conclusion that his symptoms were

not severe.  AR 35.  Dr. Sharma's records, in particular, indicate improvement in Plaintiff's chronic

fatigue symptoms.[5]  This, however, begs the question "as compared to what?"  Because the ALJ

found that Plaintiff's chronic fatigue syndrome never rose to the level of a "severe impairment,"

any improvement in those symptoms would obviously support a finding that the symptoms were

not disabling.  Other records indicate that despite some improvement, Plaintiff continued to

complain of chronic fatigue, weakness, headaches and memory and concentration deficits.  Plaintiff

also testified at the February 2012 hearing that he continued to experience severe symptoms of

fatigue, sleep deprivation and weakness.

The Court also finds that the ALJ did not provide clear and convincing reasons for rejecting

the  Plaintiff's testimony regarding the severity of his chronic fatigue symptoms.  *See Molina v.*

*Astrue*, 674 F.3d 1104, 1112-3 (9th Cir. 2011), citing *Vasquez v. Astrue,* 572 F. 3d 586, 591 (9th

Cir. 2009) and *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).  The ALJ stated that

Plaintiff's testimony was not credible for the following reasons:  (1) Plaintiff testified he is unable

to work due to chronic sleep deprivation caused by his sleep apnea: however moments later, he

testified he spends most of his day sleeping; (2) despite alleging chronic headaches due to his

chronic sinusitis, he failed to even mention his headaches during his testimony; (3) Plaintiff's

statement that his chronic fatigue and chronic sinusitis severely affects his ability to perform

activities of daily living was inconsistent with other statements that he was able to perform daily

activities.  The ALJ specifically noted that Plaintiff "reported that he does his own laundry twice a

week, and only alleged minimal problems with his personal care;" and (4) Plaintiff's statements

that the many medications for his chronic fatigue and sinusitis all failed was inconsistent with the

objective treatment records.  AR 38.

The ALJ's first reason for rejecting the credibility of Plaintiff's testimony is based on a

misunderstanding of the nature of Plaintiff's chronic fatigue syndrome or hypersomnia.[6]  Plaintiff

---

[5] Some of this noted improvement occurred before the VA medical examiner rendered his
evaluation and therefore may also have been considered by him.

[6] Dr. Avidan diagnosed Plaintiff with obstructive sleep apnea, hypersomnia with sleep apnea, or
hypersomnia unspecified.  AR 1077.  Hypersomnia is defined as a sleep disorder without a clear cause, in

1  stated that he was unrefreshed by nighttime sleep and was fatigued and sleepy throughout the day,

2  which required him to take extended daytime naps.  AR 174.  This statement appears consistent

3  with the nature of the alleged illness.  The ALJ's second and third reasons were based on clear

4  misstatements of the record.  Plaintiff, in fact, testified at the hearing that he suffers from constant

5  severe headaches that are relieved with Motrin.  AR 53.  Plaintiff also testified that he tries to do

6  his laundry *once a week*, but it sometimes ends up being *every two weeks*.  AR 52.  He otherwise

7  indicated that his wife performs most of the household chores.  Plaintiff's statements and testimony

8  regarding his limited activities of daily living, overall, were consistent with his testimony regarding

9  the debilitating effects of his fatigue, weakness and other symptoms.  *See Garrison v. Colvin*, 759

10  F.3d 995, 1016 (9th Cir. 2014).  The ALJ was on firmer ground in pointing out the contradiction

11  between Plaintiff's statement that the medications for his chronic fatigue and sinusitis all failed

12  versus the reports to doctors that his symptoms improved through medication and/or CPAP

13  therapy.  Because three of the four reasons cited by the ALJ for rejecting the Plaintiff's testimony

14  are not valid, however, the Court finds that he did not provide clear and convincing reasons for

15  rejecting the credibility of Plaintiff's testimony or statements.

16      Plaintiff's statements and testimony regarding his symptoms and limitations were also

17  supported by his daughter's third party function report which was not mentioned by the ALJ in his

18  decision.   Plaintiff argues that reversal is also required because the ALJ failed to consider or

19  mention the statements of Plaintiff's daughter.  *Stout v. Commissioner, Social Sec. Admin.*, 454

20  F.3d 1050, 1953 (9th Cir. 2006) states that in determining whether a claimant is disabled, an ALJ

21  must consider lay testimony concerning a claimant's ability to work.  "Indeed, 'lay testimony as to

22  a clamant's symptoms or how an impairment affects ability to work *is* competent evidence . . . and

23  therefore *cannot* be disregarded without comment.'"  *Id.*, quoting *Nguyen v. Chater*, 100 F.3d 1462,

24  1467 (9th Cir. 1996).  "[I]f the ALJ wishes to discount the testimony of lay witnesses, he must give

25  reasons that are germane to each witness.'"  *Id.*, quoting *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th

26

27  which the person is excessively sleepy during the day.  *See*

28  www.mlm.nih.gov/medlineplus/ency/artcile/00803.htm (Accessed 3/4/2015).

1   Cir. 1993).  SSR 99-2p also points out the significance of third party lay testimony in assessing the

2   severity and limiting effects of a claimant's alleged chronic fatigue syndrome.  Ms. Mandler's third

3   party function report provided substantial support for Plaintiff's claim that the effects of his chronic

4   fatigue or asthma severely limited his activities of daily living.  AR 157-164.  Because the ALJ's

5   reasons for rejecting Plaintiff's statements and testimony regarding the severity of his symptoms

6   and limitations were not clear and convincing, his additional failure to consider and provide reasons

7   for rejecting Ms. Mandler's statements also warrants reversal of his decision.

8           Plaintiff contends that the Court should reverse and remand for the payment of benefits.

9   Alternatively, he argues that the Court should reverse and remand for further proceedings to correct

10  the errors of the Commissioner.  *Motion for Reversal (#14), pg.11.  Garrison v. Colvin*, 759 F.3d

11  995, 1019 (9th Cir. 2014) states that if additional proceedings can remedy defects in the original

12  administrative proceeding, a social security case should usually be remanded.  The court has,

13  however, established a three-part credit-as-true standard which, if satisfied, may require the court to

14  remand with instructions to calculate and award benefits.  Under this test, the court must determine

15  that (1) the record has been fully developed and further administrative proceedings would serve no

16  useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence,

17  whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were

18  credited as true, the ALJ would be required to find the claimant disabled on remand.  *Garrison*, at

19  1020, citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194, 1202 (9th Cir. 2008);

20  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495 F.3d 625, 640 (9th

21  Cir. 2007); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen v. Chater*, 80 F.3d

22  1273, 1292 (9th Cir. 1996).  Although it has been held to be an abuse of discretion not to remand

23  with direction to make payment when all three conditions are met, the credit-as-true rule may not

24  be dispositive on remand in all cases and the rule envisions some flexibility.  *Id.*, 759 F.3d at 1021,

25  citing *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003).  The court further states:

26          *Connett*'s "flexibility" is properly understood as requiring courts to
        remand for further proceedings when, even though all conditions of
27      the credit-as-true rule are satisfied, an evaluation of the record as a
        whole creates serious doubt that the claimant is, in fact, disabled.
28      That interpretation best aligns the credit-as-true rule, which preserves

35

> efficiency and fairness in a process that can sometimes take years before benefits are awarded to needy claimants, with the basic requirement that a claimant be disabled in order to receive benefits. Thus, when we conclude that a claimant is otherwise entitled to an immediate award of benefits under the credit-as-true analysis, *Connett* allows flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.

*Garrison*, 759 F.3d at 1021.

## CONCLUSION

Reversal is warranted in this case because the ALJ failed to provide persuasive, specific and valid reasons for not according great weight to the Veterans Administration's disability determination and failed to provide clear and convincing reasons for rejecting the credibility of Plaintiff's statements and testimony regarding the severity of his symptoms.  The record, however, contains some evidence that Plaintiff's medical condition improved after the VA medical examiner completed his evaluation in February 2010.  *See e.g.* Dr. Sharma's May 10 and June 15, 2010 office visit notes, AR 893, 895, and Dr. Raj Venkal's June 15, 2011 office visit note, stating that Plaintiff reported "overall improvement but still having sleep problems."  AR 1077.  As stated in SSR 99-2p, the medical signs and symptoms of chronic fatigue syndrome fluctuate in frequency and severity, and where improvement is anticipated, continuing disability review should be scheduled. Although the record in this case supports a conclusion that Plaintiff was disabled between the period from July 2008 through the date of the Social Security Administration's final denial of his claim on June 4, 2013, remand for further proceedings is appropriate to determine whether the reported improvement in Plaintiff's medical condition was of such a degree as to render him not disabled or no longer disabled by his impairments.   Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (Dkt. #14) be **granted** and the Commissioner's Cross-Motion for Summary Judgment (Dkt. #17) be **denied**.

**IT IS FURTHER RECOMMENDED** that this case be remanded to the Social Security Administration for further proceedings to determine whether Plaintiff was disabled during the period from June 8, 2008 through the denial of Plaintiff's claim, or whether Plaintiff's medical

conditions improved to such a degree at any time during or since that period, that he was no longer disabled.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  Appeals may been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

**DATED** this 9th day of March, 2015.

**GEORGE FOLEY, JR.**
**United States Magistrate Judge**